JOHN A. HAMBLETON, MARY E. HAMBLETON, his Wife, JACOB R. WOOLLEN AND RICHARD H. WOOLLEN *vs.* MARY ANN DARRINGTON, widow of W. H. DARRINGTON, deceased, HELEN A. CRAIG, and others.

MARY ANN DARRINGTON, and others, *vs.* JOHN A. HAMBLETON, and others.

*Descendible and Devisable Estate — When a mere Possibility, coupled with an Interest, will not pass under the Residuary clause of a Will.*

Rachel Watson, by her will, dated the 27th of December, 1834, devised and bequeathed all the residue of her estate to her friend Zachariah Woollen, in trust, to pay to her mother, sister and brothers certain annuities, and the residue of her income (to be increased by the falling in of the annuities) to her son Henry Watson for life, and upon certain contingencies, (among others, his living after her sister ceased to be single, or leaving issue,) she devised to him, his heirs, executors, administrators and assigns absolutely, not only the income, but also the entire principal of the rest, residue and remainder of her estate, with this proviso: "But in case of the decease of my son Henry before my said sister ceases to be single, or if my two brothers above named, or either of them, survives him, then in case my said son shall not have issue or descendants, I give, devise and bequeath to my said friend Zachariah Woollen, his heirs, executors, &c., absolutely, not only the income of my estate above intended for my said son, but also the entire principal of said rest, residue and remainder of my estate." Zachariah Woollen, by his will, dated the 30th of June, 1836, after directing the payment of his debts out of his estate, directed and empowered his executors, as soon as practicable after his decease, to sell and dispose of all his real, leasehold and personal estate, (his household and kitchen furniture excepted,) the proceeds arising from which sale or sales, with all the residue and remainder of his estate generally, he devised and disposed of in moieties, as follows: One moiety, including his household and kitchen furniture, he devised and bequeathed to his friends, William Rogers and James Tracey, and the survivor of them, &c., in trust, to be invested in some productive stock, &c., and that his wife Rebecca, during her widowhood, be permitted to have the dividends, &c., arising

therefrom, to the support of herself and their children during their minority; and from and immediately after the intermarriage of his wife, then in trust, that the one-third of the principal of said moiety should become the property of his wife absolutely, and the remaining two-thirds should be equally divided between their children, equally, as tenants in common; but if his wife died unmarried, the principal of said moiety should be equally divided among their children, as tenants in common—the issue of any deceased child to take the share to which the parent, if living, would be entitled; and in the event of the death of any child under age and without issue, the part or share of him or her so dying, should descend to the survivors. The remaining moiety of his estate he devised, in trust, to be invested for five years from the time of his decease; and directed that during that period the income from such investments should be paid to his sister Mary Ann Darrington and her children, and his nieces and nephews, in equal proportions. And at the expiration of five years, one-thirteenth of the principal should go absolutely to Mary Ann Darrington, and one-thirteenth to his nephew W. Lovell; and the remaining eleven-thirteenths to be held in trust, that each of his nephews named, until he attained the age of twenty-five years, and each of his nieces named, during her life, should receive one-eleventh part of the income. And as the nephews severally attained the age of twenty-five years, one-eleventh of the principal estate should then be conveyed, assigned, transferred and paid over to each one of them absolutely. The testator died in 1837, before Henry Watson. At the date of his will he was between forty-five and fifty years of age; Henry Watson was not then twenty-one; the sister of Rachel Watson was under thirty, and her brothers were over that age. The widow of the testator renounced the will and claimed her thirds, and died; letters of administration were taken out on her estate. Henry Watson died in April, 1871, without issue. Upon a petition asking for a distribution of the trust estate of Rachel Watson, it was HELD:

That Zachariah Woollen took a descendible and devisable estate under the will of Rachel Watson, but that such estate or interest was not devised or bequeathed by his will, but descended or devolved upon his heirs-at-law, or personal representatives, according to the nature of the estate, whether real or personal; and in distributing so much of the estate as was personal, one-third thereof should be assigned to the administrator of Rebecca Woollen, and the residue to the next of kin of Zachariah Woollen, as in cases of intestacy.

Whenever it is apparent from the whole will, that the testator was dealing with property in possession, specifically, the general residuary clause should be confined to property in which he had a present interest, and should not include a mere possibility, coupled with an interest, which

might never be realized, particularly when the broader construction would operate to the prejudice of children and next of kin, and in favor of persons standing in a remoter degree of relationship.

CROSS APPEALS from the Superior Court of Baltimore City; in Equity.

To the statement of the case as presented in the opinion of the Court, the following is added: In 1842, after the death of Zachariah Woollen, a bill was filed in Chancery by William Rogers (one of the trustees under the will of said Woollen,) Edward T. Myers and Rebecca, his wife, formerly widow of said Woollen, Mary E. Woollen, now Hambleton, then an infant, by her next friend, and others, against the administrators *de bonis non* of Rachel Watson, and Henry Watson, for the appointment of a trustee in the place of Woollen, deceased. The Chancellor appointed Nathaniel Williams, Esq., and after his death Henry Watson was appointed trustee. After the death of Henry Watson, which occurred in April, 1871, a petition was filed in the cause by John A. Hambleton and Mary E. Hambleton, formerly Woollen, his wife, Jacob R. Woollen and Richard H. Woollen, the children of Zachariah Woollen, asking for the appointment of a trustee in place of Henry Watson, deceased, and in accordance with the prayer of the petition, Richard H. Woollen was appointed trustee.

Afterwards on the 10th of October, 1871, Mary Ann Darrington, sister of Zachariah Woollen, and others, filed their petition in the cause against the appellants, Hambleton and others, in which they claimed that the interest of Zachariah Woollen in the property, real and personal, of Rachel Watson, passed under his will to his children and the petitioners in equal moieties. The prayer of the petition was for the appointment of a trustee in the place of Henry Watson, and that distribution of the trust estate of Rachel Watson should be made under the direction of the Court, and that one-half thereof should be allowed to the petitioners as claimants of

the one-half of the residue and remainder of the estate of the said Zachariah Woollen. To this petition, the appellants, Hambleton and others, filed their answer, in which they denied that the appellees, Mary Ann Darrington, and others, had any interest whatever in the trust estate of Rachel Woollen, and insisted that it did not pass under the will of Zachariah Woollen, but was vested in the respondents as the sole heirs-at-law and next of kin to Zachariah Woollen, and in Richard H. Woollen as administrator of their deceased mother, Rebecca Woollen; and they further averred that even if the pretentions of the petitioners could be sustained to any extent, still one-third of the personalty would go to Richard H. Woollen as administrator, and only the remaining two-thirds would be divided between the petitioners and the respondents.

The Court, (DOBBIN, J.,) on the 27th of March, 1872, passed a decree which will be found sufficiently set out in the opinion of this Court. From this decree both parties appealed.

The cause was argued before BARTOL, C. J., STEWART, BOWIE, GRASON, MILLER and ALVEY, J.

*Charles Marshall,* for Hambleton and others, contended

That the context of the will of Zachariah Woollen showed that it was not his intention to devise the interest which he had under the will of Rachel Watson, but that he made his will entirely with reference to other property.

It was obvious from the provision which he made for an immediate sale of all the property, real and personal, which he devised and bequeathed, that he could not have intended to include in it the interest in the estate of Rachel Watson. Henry Watson was then not twenty-one years of age, and all chances were in favor of the estate of said Henry being enlarged into a complete fee simple estate; and the probabilities of any beneficial interest in Woollen or his estate, were very

remote. The first clause of the will defines what Mr. Woollen devised, by showing that it was only that which was immediately saleable.

By the second clause of his will, he provided for a distribution of that part of his estate devised to the appellees, Darrington and others, among them at the expiration of five years from his decease; in view of the age of Henry Watson, and of the contingencies provided for by the will of Rachel Watson, it was apparent that Zachariah Woollen could not have contemplated or intended that there could be any distribution of his interest in the estate of Rachel Watson at the end of five years from his death, and he meant to devise only what was so distributable.

The context has defined what the testator meant by the use of the word "Estate," and independently of such context, the interest which Zachariah Woollen took under the will of Rachel Watson, was not properly described as an estate.

General expressions will be restrained by their association with terms, showing that the testator made use of them in a more limited sense. *Wilkinson vs. Merryland, Cro. Car.* 447, 449; *Markant vs. Twisden, Gilbert's Eq. Cas.* 30; *Doe d. Bunny vs. Rout,* 7 *Taunt,* 79; *Woollam vs. Kenworthy,* 9 *Ves.* 137; *Bebb vs. Penoyre,* 11 *East.* 160; *Timewell vs. Perkins,* 2 *Atk.* 102; *Reade vs. Reade,* 8 *Term,* 118; *Sanderson vs. Dobson,* 1 *Exchequer,* 141; *Shaw vs. Bull,* 12 *Mod.* 592; *Doe d. Hurrell vs. Hurrell,* 5 *Barn. & Ald.* 18; *Cook vs. Oakley,* 1 *Peere Wms.,* 302.

*William F. Frick,* for Mary Ann Darrington and others.

The executory devise in Rachel Watson's will to Z. Woollen, his heirs, executors, &c., in the event of Henry Watson not having issue or descendants, is clearly good as to her *personalty.* And whether too remote, under the construction of her entire will as to her *realty,* it is not necessary to inquire, as the trust fund in controversy is made up of personal estate.

The estate of Woollen was not a mere *possibility;* but such a vested present interest, that it was both transmissible by descent and devisable; although the contingency upon which it was to take effect in possession, had not happened at the time of his death. *Redfield on Wills, Part I.,* 388-9-90, *and notes; Redfield on Wills, Part II., p. 627, sec. 51, et seq. and cases referred to in the notes; Spence vs. Robins, 6 G. & J.,* 507; 1 *Jarman on Wills,* 40; 4 *Kent's Comm.,* 262, 284, *margin; Fearne on Contingent Remainders,* 1 — *definition of estates.*

The contingent interest in Rachel Watson's estate, held by Woollen at the time of his death, *passed under his will* to the devisees therein named. He devised not only the proceeds of sale of all his real, leasehold and personal estate, but included in that devise, *"all the rest and remainder of his estate generally."*

These words are amply sufficient, *ex vi termini* to carry the interest in controversy; and must be so construed unless it is manifest from the context of the will, that it was the intention of the testator to die intestate as to the estate devised to him by Rachel Watson.

Upon a thorough examination of his entire will, no such intention appears—but a contrary intention is fairly to be inferred. *Redfield on Wills, Part II.,* 688, *sec.* 67; *p.* 616, *sec.* 34; *p.* 728, *sec.* 34; *p.* 693, 694, *secs.* 13, 14; *p.* 448, *sec.* 10, *and Ld. Eldon's Opinion in note* 40; *p.* 442, *sec.* 5; *p.* 691, *sec.* 11; 1 *Jarman on Wills,* 681, 686, 687; see especially case of *Gover vs. Davis, vol.* 7, *Part* I, *Jurist,* 1861, *p.* 399; *Ram on Wills,* 35, 36 (*top,*) (8 *Law Library.*).

The allowance of one-third of the trust fund to the administrator of the deceased widow, would defeat the clear intention of the testator; which was, that his wife and children should take one-half of his entire estate, and his nephews and nieces the other one-half.

As the children are entitled to take from the mother, through her administrator, the practical effect of the allow-

ance made by the decree is to give two-thirds of the trust fund, at this time, to the children, and one-third only to the nephews and nieces.

It was *not* the intention of the testator that the children should be put even upon an *equal* footing with the nephews and nieces; certainly not in a *better* position. In case the widow married again—the nephews and nieces were still to retain their one-half, while the children were to receive only two-thirds of one-half; showing the testator's intention, that the widow's claims were to be made good against the one-half devised in trust for her and the children. The children's share was *exclusively* charged by the life estate, devised to the wife, and by the one-third given her in case of a second marriage. There is no principle of natural justice involved in the inquiry—but simply a question of intention. That the testator was possessed by some potent and controlling motive, which induced him to give the entire one-half of his estate away from his wife and own children, to his sister's children, is clearly apparent; and also that he meant to charge upon the children's share, the provision for the mother, whether she married again or not. It would defeat that intention to allow the widow's renunciation to have the effect of charging the nephews and nieces *to the same extent* as the children. The destruction of the entire provisions of the will by this decree is made more glaring, when we consider that it was the clear intention of the testator, that the children, after the mother's death, were to have no more than one-half the estate, while this distribution as regards this particular fund, gives them virtually two-thirds.

Bowie, J., delivered the opinion of the Court.

The question presented by the cross appeals in this case is, whether the estate or interest devised or bequeathed by Rachel Watson to Zachariah Woollen, passed by the will of the latter, to the trustees therein named, to be distributed under its provisions, or devolved upon his heirs and next of

kin; in other words, whether Zachariah Woollen 'died testate or intestate, as to the property bequeathed by Mrs. Watson.

Mary Ann Darrington and her co-petitioners claim, under the will of Z. Woollen, one-half of the fund devised by Mrs. Watson. Hambleton and wife and their co-defendants are children and representatives of Z. Woollen and Rebecca, his widow, and as such claim that the fund in question was not disposed of by their father's will, but is to be distributed as in cases of intestacy.

Mrs. Rachel Watson, by her will, dated the 27th of December, 1834, devised and bequeathed all the residue of her estate to her friend Z. Woollen, in trust, to pay to her mother, sister and brothers certain annuities, and the residue of her income (to be increased by the falling in of the annuities) to her son Henry Watson for life, and upon certain contingencies (among others, his living after her sister ceased to be single, or leaving issue,) she devised to him, his heirs, executors and administrators absolutely, not only the income, but also the entire principal of the rest, residue and remainder of her estate, with this proviso: " But in case of the decease of my son Henry, before my said sister ceases to be single, or if my two brothers above named, or either of them survives him, then in case my said son shall not have issue or descendants, I give, devise and bequeath to my said friend Zachariah Woollen, his heirs, executors, administrators and assigns absolutely, not only the income of my estate, above intended for my said son, but also the entire principal of said rest, residue and remainder of my estate."

Z. Woollen, by his will, dated the 30th of June, 1836, and proved the 16th of August, 1837, after directing the payment of his debts out of his *estate*, directed, authorized and empowered his executors, as soon as practicable after his decease, to sell and dispose of all his real, leasehold and personal estate, (except his household and kitchen furniture;) the proceeds arising from or by which sale or sales, with all the residue

and remainder of his estate generally, he devised and disposed of in moieties, viz:

1st. One moiety, or equal half part thereof, (in which is to be included all his household and kitchen furniture,) he devised and bequeathed to his friends, William Rogers and James Tracey, and the survivor of them, etc., in trust, to be invested in some productive stock, etc., and that his wife Rebecca, during her widowhood, be permitted to have the dividends, rents, profits, interest and income arising therefrom to the support and maintenance of herself and their children during their minority; and from and immediately after the intermarriage of his wife with any person, then in trust, that the one-third of the principal of the said moiety, or half part of his estate, shall become the property of and be forthwith conveyed and transferred to his said wife Rebecca, her heirs, etc., absolutely, and the remaining two-thirds thereof shall become the property of and be equally divided between the children he then had, or might thereafter have, their heirs, etc., absolutely, as tenants in-common, share and share alike; but in case his wife should not intermarry, then immediately after her decease, the principal of said entire moiety, or half part of his estate, should become the property of and be equally divided between the children he then had and those he might thereafter have, their heirs, executors, etc., as tenants in common, etc.—the issue of any deceased child (if any such) to take the share to which the parent would, if living, be entitled; and in the event of the death of any child under age and without issue, the part or share of him or her so dying, should descend to the survivors.

2d. The remaining or equal half part of his *estate* he devised to the same trustees, in trust, to be invested in some productive stock, etc., *for the period of five years from the time of his decease;* and during that period his sister Mary Ann Darrington and her children, and his nieces and nephews, be permitted and suffered, in equal proportions, to take, receive and have applied for their separate use and sole benefit the

dividends, etc., arising therefrom, etc. And at the expiration of said five years, then in trust, that one-thirteenth part of the principal be conveyed and assigned to Mary Ann Darrington; one-thirteenth of the principal to his nephew William Lovell, absolutely, and the remaining eleven-thirteenths to be held in trust for his *nephews and nieces*; for *his* nephews until they attained twenty-five years, and for his nieces during their respective natural lives, etc.

Z. Woollen died before Henry Watson, in the year 1837. It is admitted that he (Woollen) was between forty-five and fifty years of age at the date of his will; that Henry Watson was not then twenty-one; and Caroline Price, Thomas J. Price and Nicholas Price, the sister and brothers of Mrs. Rachel Watson, were all of mature age, and all but Caroline over thirty years of age.

Rebecca, widow of Z. Woollen, renounced the will and claimed her thirds, and is since dead, and Richard H. Woollen is her administrator. It is further admitted that Henry Watson is deceased, and has left no issue or descendants. The Court below decided that Z. Woollen took a descendible and devisable estate, under the will of Rachel Watson, and that the said Z. Woollen did devise the said estate, under his last will and testament, and decreed that, in distributing the same, the auditor should allow one-third of the fund, so far as it is personalty, to the administrator of Rebecca Woollen, deceased, widow of Z. Woollen, and the balance of the fund to be distributed according to the provisions of the will of Z. Woollen, to the parties entitled thereunder—from which decree both parties appealed.

As the petitioners and respondents claim under Z. Woollen, the uncle of the one class and father of the other, it might be assumed that the interest of their testator, or intestate, was descendible and devisable. A few authorities, however, will be referred to.

"All estates which are transmissible, either by operation of law or by act of the owner, are held devisable. This, it has

been long held, extends to a possibility, if it is not a mere naked expectancy, but be coupled with an interest." *Redfield on Wills, part* 1, *p.* 388, 389; *Fearne on Con. Rem.*, 371.

"All contingent estates of inheritance, as well as springing and executory uses and possibilities, coupled with an interest, where the person to take is certain, are transmissible by descent, and are devisable." 4 *Kent's Com's.*, 261.

"Where the testator bequeaths his personal estate to A, and if he shall die without issue to B, there is such a vested interest in B, if he survive the testator, that although he should die in the life time of A, the estate will pass under a devise from him, or will go to his personal representatives, in the event of A dying without issue." *Barnes vs. Allen*, 1 *Brown's C. C.*, 181; *Perry vs. Woods*, 3 *Ves.*, 204, 208; 2 *Redfield on Wills, p.* 627, *sec.* 51.

The Court below is fully sustained in the position, that Z. Woollen took a descendible and devisable estate. The next inquiry is, whether he did devise or bequeath the said estate under his last will and testament. This is purely a question of intention, to be determined by the construction to be placed upon the initial clause of the deceased testator's (Woollen's) will, elucidated by the subsequent provisions of the trust, and interpreted by the light of surrounding circumstances.

The meaning of words depends essentially upon the condition and situation of those using them, whether written or spoken; they are limited by the horizon of the mind, and we must try to ascertain its scope at the moment of writing.

If we recur to the language of the clause describing the property to be disposed of by his executors, we find it is confined to "all my (his) real, leasehold and personal estate," the proceeds arising from which sales, "*with all the residue and remainder of my (his) estate generally,*" he devises and disposes of in manner following. (See clauses previously cited.)

The fund is to be divided in equal moieties.

How could a possibility coupled with an interest, dependent upon the contingency of Henry Watson's death without issue, be divided?

The fund was also to be invested in some safe stock, one moiety for the support and maintenance of his widow and children during their minority; the other moiety, for the period of five years, for the use of nephews and neices, and then to be divided into thirteen parts — and two-elevenths absolutely paid over and assigned. Such an interest as that conferred by the Watson will, was not susceptible of valuation, investment or division, and therefore could not be included "*ex vi termini*" in its provisions. But when we recall the relative ages of the legatee for life, with a contingent remainder absolutely in himself, and of the legatee in remainder, depending on the death of the legatee for life without issue, it is almost impossible to conceive so remote a contingency could have entered the testator's mind, in the disposition of his affairs.

The terms of the trust indicate that the property to be invested was in possession, not in reversion; that in five years at farthest, there was to be a division of one moiety into thirteen parts, and an absolute conveyance of two-thirteenths, without any provision for a prospective or future distribution. The authorities abundantly show that although the tendency of the Courts is, to include the whole estate in the word "residue," when there is no other residuary clause, and in the words of Lord ELDON, "the safest course is to abide by the words unless upon the whole will there is something amounting almost to demonstration, that the plain meaning of the word is not the meaning of the testator," (*Crooke vs. DeVandes, 9 Ves.,* 197; 2 *Redfield on Wills,* 448,) yet the converse of the proposition is true, where the provisions of the will preclude the possibility of giving such a construction. It does not appear from the record, whether the subject-matter of the devise was real or personal estate, or consisted of both.

After acquired real estate would not pass by a residuary clause. *Kemp's Ex'x vs. McPherson,* 7 *H. & J.,* 320.

The effect of the words "all the rest and residue of my estate" was held to be limited by the words "chattels, real

and personal" succeeding, in the case of *Markant vs. Twisden*, 1 *Equity Cases*, 211; the latter confining the former to things of a like kind, and therefore a reversion in lands was excluded. So in *Doe, dem. Bunny, vs. Rout*, 7 *Taunt.*, 79, the words "all my stock in trade and every other thing, my property of what nature or kind soever, to and for her own proper use" were held not to convey land.

In *Walters vs. Walters*, 3 *H. & J.*, 204, it was held the words "all the remainder of my estate" were limited by preceding words to the personal estate, and the reversion in fee, not being disposed of, descended to the heir-at-law.

In *McChesney vs. Bruce*, 1 *Md.*, 346, the words "all the residue of my estate" were confined to personalty, because the preceding bequests were altogether personal, upon the principle of "*noscitur a sociis;*" which is but a modification of the rule, that the meaning of the words is governed by the intention apparent in the whole will.

"In the first case," Ch. J. CHASE says, "In deciding on the operation and effect of these words, the Court must consider the whole will for the purpose of ascertaining the intention of the testator."

The same reason will apply, not only to the kinds of property whether real or personal, but to the nature of the estate, whether in possession or expectancy.

The case of *Cook vs. Oakley*, 1 *Peere Wms.*, 302, shows that the will made at sea, by a man not aware that he had succeeded to a leasehold estate, by the death of his father, would not pass the leasehold to the legatee under the words, "and all things not before bequeathed," but should be confined to things "*ejusdem generis.*"

We think it is a fair deduction from these cases, that whenever it is apparent from the whole will, the testator was dealing with property in possession specifically, the general residuary clause should be confined to property in which he had a present interest, and not include a mere possibility, coupled with an interest, which might never be realized;

particularly when the broader construction would operate to the prejudice of children and next of kin, and in favor of persons standing in a remoter degree of relationship.

We are therefore of opinion that the estate or interest devised and bequeathed by Rachel Watson to Zach. Woollen, was not devised or bequeathed by his will, but descended or devolved upon his heirs-at-law, or personal representatives respectively, according to the nature of said estate, whether real or personal; and in distributing so much of said estate as is personal, the auditor should assign to the administrator of Rebecca Woollen, deceased, one-third, and the residue to the next of kin of Zachariah Woollen, as in cases of intestacy.

> *Decree reversed and*
> *cause remanded.*